IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| LAWRENCE TACHIBANA; LISA TACHIBANA; ALBERT LEONG; ROGER BRAUN; ROBERT R. BRAY; and JOHANNE BRAY;<br><br>        Plaintiffs,<br><br>    vs.<br><br>COLORADO MOUNTAIN DEVELOPMENT, INC., dba LONE OAK LAND DEVELOPMENT COMPANY, L.P.; LONE OAK LAND DEVELOPMENT COMPANY, LLC; C.M.D. MANAGEMENT, INC.; 3D RESORTS, INC.; WILLIAM HANNAH; BANK OF AMERICA, N.A.; JERRY DUNN, in his personal capacity,<br><br>        Defendants.<br>_____ | CIV. NO. 07-00364 SOM/BMK<br><br>ORDER GRANTING DEFENDANT BANK OF AMERICA'S MOTION FOR SUMMARY JUDGMENT |

ORDER GRANTING DEFENDANT BANK OF AMERICA'S
MOTION FOR SUMMARY JUDGMENT

I.        INTRODUCTION.

          Plaintiffs invested in a Texas development that was never built.  Among the many Defendants named in the sixteen-count First Amended Complaint filed by disappointed Plaintiffs on January 13, 2009, are not only companies responsible for the development but also Bank of America, N.A. ("BOA"), which loaned Plaintiffs money to purchase vacant land in the development.  Plaintiffs claim that BOA was more than a lender and seek to hold BOA liable as a partner on the project.  Plaintiffs also seek to

hold BOA responsible for the actions of William Hannah, the developer's representative, who solicited Plaintiffs' investments in the project.  Plaintiffs claim that Hannah acted as BOA's agent and that BOA should therefore be responsible for his actions.

Plaintiffs assert ten claims against BOA: Breach of Implied Covenant of Good Faith and Fair Dealing (Count IV); Intentional Misrepresentation/Fraud (Count V); Negligent Misrepresentation (Count VI); Detrimental Reliance (Count VII); Unfair and Deceptive Trade Practices, H.R.S. § 480-2 (Count VIII); Fraud, Fraudulent Concealment, and Deceit (Count X); Rescission (Count XI); Violation of the Truth in Lending Act and Regulation Z (Count XIII); Violation of the Real Estate Settlement Practices Act (Count XIV); and Agency/Partnership Liability (Count XVI).  See First Amended Complaint, Jan. 13, 2009, ECF No. 108.

On April 5, 2010, BOA filed a motion for summary judgment.  See ECF No. 345.  Because Plaintiffs fail to demonstrate any statutory violations by BOA and fail to raise a genuine issue of fact as to whether BOA was a partner in the project or whether Hannah was acting as BOA's agent, summary judgment is granted in favor of BOA on all claims asserted

against it.[1]  This motion is decided without a hearing pursuant

to Local Rule 7.2(d).

II.      STANDARD OF REVIEW.

        Summary judgment shall be granted when "the pleadings,

the discovery and disclosure materials on file, and any

affidavits show that there is no genuine issue as to any material

fact and that the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(c).  One of the principal purposes of

summary judgment is to identify and dispose of factually

unsupported claims and defenses.  Celotex Corp. v. Catrett, 477

U.S. 317, 323-24 (1986).  Accordingly, "[o]nly admissible

evidence may be considered in deciding a motion for summary

judgment."  Miller v. Glenn Miller Prods., Inc., 454 F.3d 975,

988 (9th Cir. 2006).  Summary judgment must be granted against a

party that fails to demonstrate facts to establish what will be

---

[1]Mark and Yvette Scribner were Plaintiffs in this action.
However, a Stipulation for Dismissal of their claims was filed on
January 5, 2010.  See Stipulation for Dismissal of All Claims by
Plaintiffs Mark Scriber and Yvette C. Scribner, Jan. 5, 2010, ECF
No. 254.

        Similarly, Alva Blake and Puanani Blake were Plaintiffs in
this action.  However, a Stipulation for Dismissal of their
claims was filed on April 7, 2010.  See Stipulation for Dismissal
of All Claims by Plaintiffs Alva E. Blake and Puanani Blake aka
Helen Puanani Blake, Apr. 7, 2010, ECF No. 360.

        The court additionally notes that both Plaintiffs and BOA
filed documents in violation of the court's local rules regarding
font sizes.  See Local Rule 10.2(a).  In all future filings with
this court, the parties are required to comply with the font size
requirements set forth in Local Rule 10.2(a), including in
footnotes.

an essential element at trial.  See Celotex, 477 U.S. at 323.  A moving party has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment. Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000).  The burden initially falls on the moving party to identify for the court "those portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact."  T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citing Celotex Corp., 477 U.S. at 323); accord Miller, 454 F.3d at 987. "A fact is material if it could affect the outcome of the suit under the governing substantive law."  Miller, 454 F.3d at 987.

When the moving party fails to carry its initial burden of production, "the nonmoving party has no obligation to produce anything."  In such a case, the nonmoving party may defeat the motion for summary judgment without producing anything.  Nissan Fire, 210 F.3d at 1102-03.  On the other hand, when the moving party meets its initial burden on a summary judgment motion, the "burden then shifts to the nonmoving party to establish, beyond the pleadings, that there is a genuine issue for trial."  Miller, 454 F.3d at 987.  This means that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (footnote omitted).  The

4

nonmoving party may not rely on the mere allegations in the pleadings and instead "must set forth specific facts showing that there is a genuine issue for trial." Porter v. Cal. Dep't of Corr., 419 F.3d 885, 891 (9th Cir. 2005) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).  "A genuine dispute arises if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." California v. Campbell, 319 F.3d 1161, 1166 (9th Cir. 2003); Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000) ("There must be enough doubt for a 'reasonable trier of fact' to find for plaintiffs in order to defeat the summary judgment motion.").

On a summary judgment motion, "the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor." Miller, 454 F.3d at 988 (quotations and brackets omitted).

III.     BACKGROUND.

Plaintiffs allege that they are residents of Kauai who purchased residential lots in a subdivision in Lone Oak, Texas, called The Villages at Lone Oak Subdivision. See Compl. ¶¶ 1-10, 24, 29-33.  The development project was allegedly owned and managed by Defendants Colorado Mountain Development, Inc., Lone Oak Development Company, L.P., Lone Oak Land Management, LLC, CMD Management, Inc., 3D Resorts, Inc., and/or Jerry Dunn (collectively, "Lone Oak").  See Compl. ¶¶ 11-15, 17-18.

Plaintiffs allege that Defendant William Hannah was the land sales representative for Lone Oak and that Hannah solicited Plaintiffs' purchases in the development.  See Compl. ¶¶ 23-24, 29, 31, 33.

Defendant BOA was the mortgage lender for Plaintiffs' purchases.  See Adjustable Rate Notes attached as BOA's Ex. U (BOA 00490-95--Roger J. Braun Note; BOA00614-19--Robert and Johanne Bray Note; BOA 00342-47--Albert E. Leong Note; BOA 01431-36--Lisa Tachibana Note).  Some Plaintiffs purchased additional lots at Lone Oak that were financed by other lenders, such as Wachovia.  See, e.g., Deposition of Albert Leong at 79-82, Jan. 29, 2010, ECF No. 427.

Before selling property for Lone Oak, Hannah had ten days of "intensive training" by Lone Oak.  See Videotaped Deposition of William Hannah at 121-22, June 29, 2010, ECF No. 420-2 (attached to Plaintiffs' Concise Statement as Ex. A). Hannah had no prior experience selling real estate and said that he was relying on Lone Oak to teach him how to sell property correctly.  Id. at 122-23.  Hannah says that he gave the sales presentation that Lone Oak taught him to give.  Id. at 127, 133.

Hannah testified that he was trained by Lone Oak to tell potential purchasers BOA was part of the development, as BOA's involvement was seen as a big selling point.  Id. at 20, 157.  Hannah clarified that he was told "that Bank of America was

a financial institution involved with the project, who we could get financing through for our clients." Id. at 22.  Hannah understood that BOA was "one of the lending institutions that offered financing to potential buyers."  Id.  Hannah testified that, to his knowledge, BOA was not involved with Lone Oak in any way other than as a financial institution that offered financing to buyers.  Id. at 22-23.  Lone Oak's training manual confirms that BOA offered "a type of financing."  See The Villages at Lone Oak, Revised 2006 Training & Policy Manual at 17, ECF No. 420-3 (attached to Plaintiffs' Concise Statement as Ex. C).

Hannah says that he sold everything "by the book," meaning that he did what Lone Oak taught him to do.  Hannah Depo. at 143, June 29, 2010, ECF No. 420-2.  Hannah says that he stressed BOA's relationship to the development to potential purchasers.  Id. at 159.

Hannah and Plaintiff Lawrence Tachibana met in November 2002.  See Deposition of Lawrence Tachibana at 35-39, Jan. 28, 2010, ECF No. 424.  In early 2005, Tachibana introduced Hannah to Plaintiffs Albert Leong and Roger Braun at a construction industry conference in Las Vegas.  Id. at 38-39.  Hannah told them about Lone Oak, but no sales were made at that time.  Id. at 39-40.  A few months later, on April 2, 2005, Hannah flew to Hawaii to discuss the development with Tachibana and his wife, Plaintiff Lisa Tachibana.  Id. at 40-41, 43.

Hannah showed the Tachibanas various marketing materials, including a document listing BOA and Developer Finance Corporation as "Banking Partners in the Development of Villages at Lone Oak."  Pl. Ex. D; Lawrence Tachibana Depo. at 43, ECF No. 424; Lisa Tachibana Depo. at 84, March 15, 2010, ECF No. 420-7 (attached as Ex. F to Plaintiff's Concise Statement).  Hannah allegedly told at least some Plaintiffs that BOA was a "partner" in the project.  See Lisa Tachibana Depo. at 84, ECF No. 420-7; Lawrence Tachibana Depo. at 55.  The document referring to BOA as a "banking partner" was allegedly displayed all over the Lone Oak offices.  See Video Deposition of Gary Cooper at 114, June 28, 2010, ECF No. 420-4 (attached to Plaintiffs' Concise Statement as Ex. C).

Hannah was the only person who supposedly told the Tachibanas that BOA was Lone Oak's partner.  See Lawrence Tachibana Depo. at 55, Jan. 28, 2010, ECF No. 424.  Lawrence Tachibana says that Hannah also told him that BOA was "guaranteeing that this project is going to get done."  Lawrence Tachibana Depo. at 47.  For his part, Hannah denies having told Tachibana that BOA was a partner or that BOA was guaranteeing the completion of the project.  See Hannah Depo. at 49, ECF No. 431. Hannah allegedly told Tachibana that The Villages at Lone Oak was the only development on the lake that would have a full-service marina and that the marina was going to be allowed because of

8

BOA's relationship to the developer.  Lawrence Tachibana Depo. at 44.

Hannah prepared a handwritten worksheet with the Tachibanas' personal information and the "rough" terms of potential financing.  See Pl. Ex. Q, ECF No. 420-18; Deposition of William Hannah at 53-57, ECF No. 431.  Hannah testified that he called Lone Oak to "find out what their scores were." Id. at 54.  The Tachibanas claim that Hannah told them that they could purchase adjacent lots, Numbers 72 and 73 in the project, with a single loan from BOA.  See Lawrence Tachibana Depo. at 66, ECF No 424.  The Tachibanas say that part of the reason they agreed to purchase lots in the Villages at Lone Oak was their belief that BOA was a partner.  Id. at 67.  Hannah says that he did not tell the Tachibanas that he was working for BOA.  See Hannah Depo. at 61, ECF. No 431.

On or about April 7, 2005, Hannah provided the Tachibanas with a purchase agreement to sign and several forms needed to begin the loan application process with BOA, including a "mini-application" and a credit card authorization to cover BOA's application fee.  See Lisa Tachibana Depo. at 105-08, ECF No. 426; Real Estate Purchase Contract (Apr. 7. 2005), Pl. Ex. Y, ECF No. 420-26; "Mini-Application" and Credit Report Authorization, Pl. Ex. M at LO396, ECF No. 420-14; Fees Collected at Loan Application Disclosure, Pl. Ex. O, ECF No. 420-16; see

<u>also</u> Videotaped Oral Deposition of Phil Robinson at 81, ECF No. 434 (former BOA loan officer who described the "mini-application").  Hannah sent the completed purchase agreement and other forms to Lone Oak, which sent the documents to BOA.  <u>See, e.g.,</u> Hannah Depo. at 182-83, ECF No. 431 (discussing procedure with respect to another loan).

Hannah made similar in-person presentations to Braun and Leong, allegedly telling them that BOA was a "partner."  <u>See</u> Deposition of Roger Braun at 25-26, Mar. 17, 2010, ECF No. 428; Deposition of Albert Leong at 53-54, 60, 63, Jan. 29, 2010, ECF No. 427.  Hannah also made a presentation to the Brays over the phone and through the mail.  <u>See</u> Robert Bray Depo. at 53-54, 61-66, ECF No. 429; Johanne Bray Depo. at 18, 23, 27-28, 30, ECF No. 430.  Hannah allegedly showed Braun, Leong, and the Brays the document listing BOA as a "banking partner."  <u>See</u> Leong Depo. at 54, ECF No. 427; Braun Depo. at 31, ECF No. 428; Johanne Bray Depo. at 19-20, ECF No. 430.

Hannah directed at least some Plaintiffs to the Lone Oak website, which allegedly mentioned BOA.  <u>See, e.g.,</u> Johanne Bray Depo. at 16-17.

Each Plaintiff purchased one or more lots in The Villages at Lone Oak, using BOA financing.  <u>See</u> Adjustable Rate Notes, BOA's Ex. U., ECF. No. 351.

10

Hannah filled out a worksheet with each Plaintiff, listing what he believed were rough potential financing terms. See Pl. Ex. Q (hand-written worksheets for Leong, LO048155; Braun, LO047501; and the Brays, LO047543); see also Hannah Depo. at 56-57, ECF No. 431.  Hannah guaranteed a 5.5% interest rate. See Leong Depo. at 65-66, ECF No. 427; Braun Depo. at 76, ECF No. 428; Johanne Bray Depo. at 30-31, ECF No. 430.  Plaintiffs' worksheets indicate that Hannah would "buy down" or "buy DN" the quoted 5.5% rate.  See Pl. Ex. Q, ECF. No. 420-18.  Hannah understood that BOA's interest rates varied constantly and planned to personally pay the difference between the rate available at closing and 5.5% to ensure Plaintiffs received the quoted rate.  This "buy down" was Hannah's idea, designed to increase his sales.  See Hannah Depo. at 136-37, 186-89, ECF No. 431.

Hannah says that he helped Plaintiffs apply for the loans by collecting various loan documents from them to submit to BOA. Hannah testified that he was told by a BOA loan officer, Phil Robinson, that this would make the loan process faster.  See Hannah Depo. at 68-69, ECF No. 431.  Hannah testified that, because buyers often failed to submit all of the necessary documents to Robinson of BOA, Robinson sent Hannah a list of all the necessary documents so that Hannah could make sure that all documents were submitted the first time.  Id. at 78-79.  Hannah

spoke with Robinson on a daily basis.  They sometimes joked that Hannah was doing Robinson's work because Hannah was in Hawaii collecting the necessary loan application documents from the Hawaii applicants.  Id. at 143-45.  Despite these jokes, Hannah was neither paid anything by BOA nor thought he should have been paid by BOA.  In other words, it was clear to Hannah that he was not working for BOA, even though he was collecting documents to make sure that loan applications submitted to BOA were complete. Id. at 39, 145; See also Affidavit of Cynthia Chism ¶¶ 9-14, Apr. 5, 2010, ECF 348-1.  Hannah presumably wanted the loan application process to move quickly so that he would get paid his commission by the developer.  See Hannah Depo. at 23, 75-76. Although some Plaintiffs may have thought that Hannah was representing BOA by collecting the documents, it is not uncommon for realtors, builders, and developers to collect such information and turn it over to lenders such as BOA.  See Affidavit of Cynthia Chism ¶ 15, Apr. 5, 2010, ECF 348-1.

Hannah testified that he did not think BOA was "getting a cut" of the sales.  Id. at 37.  A regional sales representative for BOA, Cynthia Chism, confirmed that BOA was not sharing in the profits from the sales of the lots, but instead was making money from fees and interest in connection with the loans it made.  See also Affidavit of Cynthia Chism ¶¶ 1, 2, 6-7, Apr. 5, 2010, ECF No. 348-1 (attached as Ex. G to BOA's Concise Statement).  Both

BOA and Lone Oak deny that they were partners.  Deposition of Jerry Ross Dunn at 137-40, Oct. 2, 2008, ECF No. 432 (developer of the project indicating that BOA "bought a substantial amount of paper from . . . sales at the property"); Video Depo. of Gary Cooper, at 40, 58, June 28, 2010, ECF No. 435 (employee of Lone Oak indicating that BOA's status as a "banking partner" meant that it offered alternative financing, not that BOA was highly involved in the development in a capacity other than that of providing financing);  Robinson Depo. at 24, ECF No. 434 (BOA loan officer indicating that BOA's only relationship to the project was doing loans); Chism Aff. ¶ 6-7.

Hannah testified that he sold about 50 lots in the development.  Hannah said that purchasers used Merchant Mortgage Company, Developer's Finance Company, Wachovia, and BOA as lenders.  See Hannah Depo. at 37-38.  Hannah testified that he steered Plaintiffs, who had high credit scores, to BOA because BOA had the best available interest rates.  Id. at 37-38.

BOA says it did not approve Hannah's alleged representations regarding BOA's loan terms or involvement in the Lone Oak project.  Nor did it approve the use of the BOA logo in the marketing material or any reference to BOA as the developer's "banking partner."  See Affidavit of Cynthia Chism ¶¶ 9-14, Apr. 5, 2010, ECF 348-1.

Plaintiffs' asserted belief that BOA was Lone Oak's partner was based entirely on Hannah's statements, the marketing materials they received from Hannah, and the Lone Oak website. See Lawrence Tachibana Depo. at 55-56, Jan. 28, 2010, ECF No. 424; Johanne Bray Depo. at 20-21, ECF No. 430; Leong Depo. at 53-55, ECF No. 427; Braun Depo. at 49, ECF No. 428.

It is undisputed that each Plaintiff received a package of loan closing documents that included an Adjustable Rate Note, Adjustable Rate Rider, and accurate Truth in Lending Act disclosures.  See BOA's Concise Statement at 5, ECF No. 346 ("BoA provided to Plaintiffs the disclosures required by the Truth in Lending Act ('TILA').") and ("The TILA disclosure that BoA provided to each Plaintiff accurately describes the finance charge, the amount financed, and the annual percentage rate for the Plaintiff's loan."); Local Rule 56.1(g) ("For purposes of a motion for summary judgment, material facts set forth in the moving party's concise statement will be deemed admitted unless controverted by a separate concise statement of the opposing party."); see also BOA's Exs. T, U, V, ECF Nos. 350-4, 351, and 351-1.  Each Plaintiff received a thirty-year loan with a fixed interest rate of 5.5% for the first five years and a variable rate thereafter.  See BOA's Ex. U, ECF No. 351.

Plaintiffs do not dispute that the lots they purchased were vacant land, containing no structures of any kind, and that

Plaintiffs' loans from BOA covered only the purchases of the lots.  See BOA's Concise Statement at 5, ECF No. 346 ("The lots that the Plaintiffs purchased at Lone Oak were vacant or unimproved."); Local Rule 56.1(g).  See also Summary Appraisal Reports for Braun and Bray, ECF No. 349-2 (indicating that the land was vacant) (attached to BOA's Concise Statement as Ex. M); Plaintiff Albert Leong's Response to Defendant Bank of America, N.A.'s First Request for Admissions . . . to Plaintiff Albert Leong No. 6, ECF 349-4 (admitting that BOA loan proceeds were not intended to fund the construction of a home or structure) (attached to BOA's Concise Statement as Ex. O); Plaintiff Lisa Tachibana's Response to Defendant Bank of America, N.A.'s First Request for Admissions . . . to Plaintiff Albert Leong No. 6, ECF 350 (attached to BOA's Concise Statement as Ex. P) (same); Johanne Bray Depo. at 119, ECF No. 430 ("I knew that nothing was there yet except the roads when we purchased that property."); Braun Depo at 84, ECF No. 428 ("Q. Did you ever tell anyone at Bank of America that you might build a house on it?  A. No.").

IV.      ANALYSIS.

Plaintiffs claim that BOA failed to comply with federal statutes requiring certain disclosures about the terms of mortgage loans.  Plaintiffs also claim that BOA is responsible for the fraud and other torts allegedly committed by Hannah and

Lone Oak, arguing that Hannah was BOA's agent and that Lone Oak was BOA's partner.

      A.    Summary Judgment to BOA is Granted With Respect <u>to the Alleged Statutory Violations.</u>

      1.   <u>Truth in Lending Act Claims (Count XIII).</u>

The Truth in Lending Act ("TILA"), 15 U.S.C. § 1601-51, "is designed 'to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit.'" <u>Barrer v. Chase Bank USA, N.A.</u>, 566 F.3d 883, 887 (9th Cir. 2009) (quoting 15 U.S.C. § 1601(a)).  Under TILA and its implementing regulations, absolute compliance by creditors is required and "'[e]ven technical or minor violations of the TILA impose liability on the creditor.'" <u>Rubio v. Capital One Bank</u>, — F.3d —, 2010 WL 2836994, at *3 (9th Cir. July 21, 2010) (quoting <u>Hauk v. JP Morgan Chase Bank USA</u>, 552 F.3d 1114, 1118 (9th Cir. 2009), and <u>Jackson v. Grant</u>, 890 F.2d 118, 120 (9th Cir. 1989)).

Plaintiffs allege in the Complaint that BOA violated TILA in three ways: by failing to notify Plaintiffs of their right to rescind, <u>see</u> Compl. ¶ 131(a); by failing to provide required disclosures, <u>see</u> Compl. ¶¶ 131(b)-(c); and by miscalculating, failing to include, or improperly including certain loan terms in its disclosures, <u>see</u> Compl. ¶¶ 131 (d)-(f).

a. Summary Judgment is Granted on the TILA
Rescission Claims.

Under TILA, a consumer has a right to rescind a loan
when a lender is given a security interest "in any property which
is used as the principal dwelling of the person to whom credit is
extended."  15 U.S.C. § 1635(a); see also 12 C.F.R. § 226.23(a)
("In a credit transaction in which a security interest is or will
be retained or acquired in a consumer's principal dwelling, each
consumer whose ownership interest is or will be subject to the
security interest shall have the right to rescind the transaction
. . . ."). TILA defines "dwelling" as a "residential structure."
15 U.S.C. § 1602(v).

As discussed above, Plaintiffs do not dispute that all
of Plaintiffs' loans were secured by vacant lots--lots that did
not contain residential structures.  At best, Plaintiffs intended
to build structures on the vacant land.  BOA's loans to
Plaintiffs allowed them to purchase the land, not fund the
construction of the intended structures.  Had BOA's loans to
Plaintiffs been for construction of principal dwellings on the
vacant lots, TILA would have applied.  See 12 C.F.R., Part 226,
Supp. I, cmt. 2(a)(24)(7) ("A residential mortgage transaction
includes a loan to finance the construction of a consumer's
principal dwelling on a vacant lot previously acquired by the
consumer."). Because BOA did not acquire security interests in
Plaintiffs' principal dwellings and instead acquired security

interests in vacant land, the right of rescission under TILA is inapplicable and BOA is entitled to summary judgment on the TILA rescission claims.

Plaintiffs' reliance on Charnita, Inc. v. F.T.C., 479 F.2d 684, 686-87 (3d Cir. 1973), for the proposition that the right to rescind attaches to a loan for vacant land if the consumer intends to build a residence on the land is misplaced. Charnita involved an earlier version of § 1635(a). In that earlier version, the right to rescind applied when a security interest was acquired "in any real property which is used or is expected to be used as the residence of the person to whom credit is extended." Charnita, 479 F.2d at 686 n.2 (quoting the applicable § 1635(a)). The reference in § 1635(a) to security interests when a property is expected to be used as a residence is not in the current version of § 1635(a).

> b.   Summary Judgment is Granted on the TILA
>      Disclosure Claims.

TILA requires lenders to make various disclosures in certain consumer credit transactions. See 15 U.S.C. § 1638(a). TILA generally requires these disclosures to be "made before the credit is extended" or "before consummation of the transaction." 15 U.S.C. § 1638(b)(1); 12 C.F.R. § 227.17(b). Plaintiffs assert violations of TILA disclosure requirements. However, as discussed above, Plaintiffs do not dispute in any separate concise statement BOA's Concise Statement indicating that

Plaintiffs received accurate TILA disclosures as required by TILA.  Those facts are deemed admitted under Local Rule 56.1(g).

At best, Plaintiffs argue in their Opposition that the terms of Plaintiffs' loans were not timely disclosed and differed from the handwritten worksheets created by Hannah.  But in arguing this Plaintiffs refer only to Braun's deposition testimony stating that he did not remember having received disclosures before he received the closing documents.  See Braun Depo. at 50, ECF No. 428.  A statement of lack of recall is not the same as a denial of earlier receipt.  Plaintiffs do not explain what appear to be Braun's initials on the TILA disclosure statement.  See ECF No. 350-4 at BOA 01811-12 (attached to BOA's Concise Statement as Ex. T).  This court has no independent duty to scour the voluminous record for evidence that might support Plaintiffs' contention.  See Local Rule 56.1(f).  Under these circumstances, Plaintiffs raise no genuine issue of fact as to whether they received timely and accurate disclosures.

Plaintiffs also argue without citation to evidence in the record that BOA failed to make certain disclosures about adjustable rate mortgages, thereby allegedly violating 12 C.F.R. § 226.19(b).  See Opposition at 27, ECF No. 419.  However, no claim is asserted in the Complaint for a violation of 12 C.F.R. § 226.19(b).  See Compl. ¶ 131.  Even if such a claim were asserted, Plaintiffs fail to cite admissible evidence supporting

such a claim.  And Plaintiffs' bald claims about alleged
violations of 12 C.F.R. § 226.19(b) do not raise a genuine issue
of fact about whether proper disclosures under other sections
were made.

Plaintiffs argue that disclosures were improperly made
because the terms of the loans differed from the handwritten
worksheets prepared by Hannah.  However, BOA was only required to
issue TILA disclosures "before credit is extended" or "before
consummation of the transaction."  15 U.S.C. § 1638(b)(1); 12
C.F.R. § 227.17 (b).  "Consummation" is defined as "the time that
a consumer becomes contractually obligated on a credit
transaction."  12 C.F.R. § 226.2(a)(13); Grimes v. New Century
Mortg. Corp., 340 F.3d 1007, 1010 (9th Cir. 2003) ("consummation
cannot occur until the borrower becomes contractually obligated"
(quotations omitted)).  Even if Hannah could be said to have been
working for BOA, BOA was not required to make disclosures at the
time Hannah created his handwritten worksheets.  Plaintiffs were
not contractually obligated by those preliminary worksheets.
Moreover, no TILA violation can be maintained based on Hannah's
worksheets because it is undisputed that BOA actually made timely
TILA disclosures.  Any promise by Hannah not contained in the
loans has no bearing on the accuracy of the TILA disclosures,
which undisputedly reflect the terms of the loans.  Accordingly,
Plaintiffs' argument is unavailing.

        2.    Summary Judgment is Granted in Favor of BOA
              on the RESPA (Count XIV) Claims.

The Real Estate Settlement Practices Act ("RESPA"), 12 U.S.C. §§ 2601 to 2617, and its implementing regulations, 24 C.F.R. Part 3500, known as Regulation X, prohibit mortgage lenders from taking kickbacks and unearned fees or collecting certain prohibited charges.  12 U.S.C. §§ 2607, 2610.  RESPA also requires mortgage lenders to provide borrowers with certain disclosures.  12 U.S.C. §§ 2603-05.  RESPA applies to "federally regulated mortgage loans," which RESPA defines as including most loans secured by residential property.  See 12 U.S.C. § 2602(1). Exempted from RESPA's requirements are loans "secured by vacant or unimproved property, unless within two years from the date of the settlement of the loan, a structure or manufactured home will be constructed or placed on the real property *using the loan proceeds*."  24 C.F.R. § 3500.5(b)(4) (emphasis added).

Plaintiffs allege that BOA violated RESPA "by failing to make and provide required written disclosure, by taking . . . kickbacks and unearned fees, and by making and collecting prohibited charges" Compl. ¶ 134.  As discussed above in connection with Plaintiffs' TILA claims, it is undisputed that BOA's loans to Plaintiffs covered the purchase of vacant lots. Plaintiffs have presented no evidence indicating that they intended to erect structures or homes on the purchased properties "using the loan proceeds."  Moreover, Plaintiffs fail to

establish that they have a right to bring claims under RESPA for failure to disclose matters during the loan origination process. See, e.g., Ambriz v. Equifirst Corp., 2010 WL 2754248 (S.D. Cal. July 9, 2010) ("Courts have consistently held there is no private right of action for alleged RESPA disclosure violations during the loan origination process."). As RESPA is inapplicable, BOA is granted summary judgment with respect to the RESPA claims. See 24 C.F.R. § 3500.5(b)(4).

> 3. Summary Judgment is Granted to BOA With Respect to the Haw. Rev. Stat. § 480-2 (Count VIII) Claims.

In Count VIII Plaintiffs assert a violation of Hawaii's Unfair and Deceptive Trade Practices Act, section 480-2 of the Hawaii Revised Statutes. Plaintiffs assert that Lone Oak's representations and conduct did not fully and adequately disclose the material facts regarding Lone Oak. See Compl. ¶¶ 111-13. Although the Complaint itself does not so allege, Plaintiffs' Opposition argues that their section 480-2 claim is based on the alleged TILA violations. Because Plaintiffs fail to demonstrate any violation of TILA (or RESPA for that matter), an unfair and deceptive trade practice claim cannot be maintained based on any alleged TILA violation. Accordingly, to the extent a section 480-2 claim is asserted against BOA in Count VIII, summary judgment is granted in favor of BOA.

B.   Summary Judgment is Granted on the Alleged Tort-
     Based Claims.

Summary judgment is granted in favor of BOA on the
remaining claims asserted against it: Breach of Implied Covenant
of Good Faith and Fair Dealing (Count IV); Intentional
Misrepresentation/Fraud (Count V); Negligent Misrepresentation
(Count VI); Detrimental Reliance (Count VII); Fraud, Fraudulent
Concealment, and Deceit (Count X); Rescission (Count XI); and
Agency/Partnership Liability (Count XVI).  See First Amended
Complaint, Jan. 13, 2009, ECF No. 108.  Plaintiffs seek to hold
BOA liable for these tort-based claims based on agency and
partnership theories.  However, Plaintiffs fail to introduce any
evidence raising a genuine issue of fact as to whether Hannah was
BOA's agent or whether BOA was Loan Oak's partner.

       1.   Agency.

Plaintiffs allege that BOA is liable for Hannah's torts
because Hannah was acting as BOA's agent.  See Compl. ¶¶ 148–52.
BOA moves for summary judgment, arguing that Plaintiffs cannot
establish an agency relationship.  Because the court agrees that
Plaintiffs fail to raise a genuine issue of fact as to whether
Hannah was BOA's agent, summary judgment is granted in favor of
BOA on this issue.

"Agency is the fiduciary relationship that arises when
one person (a 'principal') manifests assent to another person (an
'agent') that the agent shall act on the principal's behalf and

23

subject to the principal's control, and the agent manifests assent or otherwise consents so to act." Restatement (Third) of Agency § 1.01. "It is well established that '[a]n agency relationship may be created through actual or apparent authority.'" State Farm Fire & Cas. Co. v. Pac. Rent-All, Inc., 90 Haw. 315, 325, 978 P.2d 753, 763 (1999) (quoting Cho Mark Oriental Food, Ltd. v. K & K Int'l, 73 Haw. 509, 515-16, 836 P.2d 1057, 1061-62 (1992)).

a.   Express Actual Authority.

Plaintiffs argue that Hannah was BOA's agent based on express actual authority. "Actual authority exists only if there has been a manifestation by the principal to the agent that the agent may act on his account and consent by the agent so to act, and may be created by *express agreement* or *implied from the conduct of the parties or surrounding circumstances*." State Farm, 90 Haw. at 325, 978 P.2d at 763 (quoting Cho Mark, 73 Haw. at 515-16, 836 P.2d at 1061-62). "Express actual authority requires an oral or written agreement between the parties that the principal has delegated authority that the agent has accepted and that authorizes the agent to do certain acts." Cho Mark, 73 Haw. at 515-16, 836 P.2d at 1061-62.

Plaintiffs fail to raise a genuine issue of fact as to whether Hannah had express actual authority to act on BOA's behalf. Plaintiffs claim that BOA, through Phil Robinson, a BOA

loan officer, gave Hannah express actual authority to act on
BOA's behalf when Hannah collected information from Plaintiffs,
including mini-applications, application fees, and other required
documents, and then had that information transmitted to BOA.
However, Plaintiffs do not say they heard or saw Robinson give
Hannah such authority, and there is no circumstantial evidence to
that effect.

Although Robinson allowed Hannah to collect that
information, there is nothing in the record indicating that
Robinson or Hannah thought Hannah was acting under BOA's express
authority to act on BOA's behalf.  To the contrary, the record
indicates that Hannah was merely helping Plaintiffs apply for the
loans by collecting various loan documents to make the loan
process go faster, knowing that many purchasers were not
submitting all of the necessary paperwork.  See Hannah Depo. at
68-69, 78-79, ECF No. 431.  Hannah was not paid by BOA and did
not believe he should have been paid by BOA.  In other words, it
was clear to Hannah that he was not working for BOA, even though
he was collecting documents to make sure that loan applicants
submitted everything necessary for BOA to make loan decisions.
Id. at 39, 145; see also Affidavit of Cynthia Chism ¶¶ 9-14, Apr.
5, 2010, ECF 348-1.  There is simply no evidence in the record
indicating that Robinson retained a level of control over Hannah
sufficient to create an agency relationship.  Plaintiffs fail to

25

demonstrate that Hannah had express actual authority to make representations on BOA's behalf or to bind BOA to loan terms.

b.   Implied Actual Authority.

Plaintiffs also argue that Hannah was BOA's agent based on implied actual authority.  An agent's implied actual authority may arise independent of any express grant of authority, or it may arise by necessary or reasonable implication to effectuate some other authority expressly conferred by the principal.  See Cho Mark, 73 Haw. at 516, 836 P.2d at 1062.  The "focus is on the agent's understanding of his authority inasmuch as the relevant inquiry is whether the agent reasonably believes, because of the conduct of the principal (including acquiescence) communicated directly or indirectly to him, that the principal desired him so to act."  Id. (quotations omitted).  Plaintiffs point to nothing in the record establishing that Hannah thought he was acting on behalf of BOA or raising a genuine issue of fact as to whether Hannah had implied actual authority.

Even assuming Hannah had authority to collect information for BOA, the court finds no genuine issue of fact as to whether Hannah thought that he had the authority to make binding representations on BOA's behalf.  See Restatement (Second) of Agency § 50 cmt. b ("Authority to contract is not inferred from authority to solicit business for the principal nor from authority to perform acts of service for the principal.").

26

Hannah also testified that he gave Plaintiffs only "rough," as
opposed to "firm," numbers when discussing BOA's loan terms.  See
Hannah Depo. at 56-57, ECF No. 431.  Because Hannah was planning
to buy down Plaintiffs' interests rates himself, he knew that BOA
was not guaranteeing the 5.5 % interest rate he quoted to
Plaintiffs.  See id. at 67.  In other words, Hannah did not
believe he was acting with the authority to bind BOA to specific
loan terms (for example, the 5.5% interest rate) when he spoke
with Plaintiffs.  Accordingly, there cannot have been any implied
actual authority on which Plaintiffs may rely in seeking damages
from BOA.

c.   Apparent Authority.

Plaintiffs' best argument is that BOA should be liable
for Hannah's actions because Hannah had apparent authority to
make representations and negotiate loan terms on behalf of BOA.
Ultimately, however, the apparent authority argument is not
supported by the facts.

Apparent authority exists when a principal does
something or permits an agent to do something that reasonably
leads a third party to believe that the agent has authority to
act on the principal's behalf.  Cho Mark, 73 Haw. at 516, 836
P.2d at 1062.  The focus is not on the intention of the alleged
principal or the alleged agent, but instead on "whether a third
party relies on the principal's conduct based on a reasonable

27

belief in the existence of such a relationship." <u>Id.</u> at 517, 836 P.2d at 1062.  The Hawaii Supreme Court has explained that apparent authority occurs when:

> (1) [T]he principal has manifested his consent to the exercise of such authority or has knowingly permitted the agent to assume the exercise of such authority; (2) . . . the third person knew of [the principal's actions] . . . and, acting in good faith, had reason to believe, and did actually believe, that the agent possessed such authority; and (3) . . . the third person, relying on such appearance of authority, has changed his position and will be injured or suffer loss if the act done or transaction executed by the agent does not bind the principal.

<u>Id.</u> at 517, 836 P.2d at 1062 (quoting <u>Knox-Tenn Rental Co. v. Jenkins Ins., Inc.</u>, 755 S.W.2d 33, 40 (Tenn. 1988)); <u>see also</u> <u>Haw. Paradise Park Corp. v. Friendly Broadcasting Co.</u>, 414 F.2d 750, 756 (9th Cir. 1969) (applying Hawaii law) ("The principal's manifestations giving rise to apparent authority may consist of direct statements to the third person, directions to the agent to tell something to the third person, or the granting of permission to the agent to perform acts and conduct negotiations under circumstances which create in him a reputation of authority in the area in which the agent acts and negotiates.").

Plaintiffs say they believed Hannah was a BOA representative who could negotiate loan terms on BOA's behalf. Assuming such a belief, this court looks to whether that belief was reasonable.  <u>See</u> <u>Cho Mark</u> 73 Haw. at 517, 836 P.2d at 1062.

Plaintiffs cite the following evidence to demonstrate the reasonableness of their asserted belief that Hannah represented BOA: (1) Hannah distributed and collected forms containing the BOA logo, including mini-applications and application fee collection forms; (2) Hannah collected financial information from Plaintiffs in connection with these forms; (3) Hannah discussed loan terms with Plaintiffs; (4) Hannah collected additional documentation required to process Plaintiffs' loans; (5) Hannah told Plaintiffs that BOA was a partner in the Villages at Lone Oak; (6) Hannah showed Plaintiffs marketing material containing BOA's logo; and (7) materials displaying BOA's logo and describing BOA as the developer's "banking partner" were displayed so frequently and prominently in the developer's office that BOA must have been aware of them and did not object, and (8) Hannah spoke daily with Robinson, a BOA loan officer.  Of those things, only the prominent display of BOA's logo and description as a "banking partner" and Hannah's daily conversations with Robinson suggest that BOA allowed or permitted Hannah to act on BOA's behalf, thereby leading Plaintiffs to believe that Hannah had the authority to bind BOA.  However, the evidence does not support either circumstance.

With respect to the display of BOA's logo and the description of BOA as the developer's "banking partner," relying on the testimony of Lone Oak's Gary Cooper, Plaintiffs claim that

29

Robinson had an office located where the displays were numerous. See Opposition at 5. This claim is misleading and unsupported by the record. Cooper actually testified that Robinson did not have a permanent office at Lone Oak and that Lone Oak only set up a temporary workspace for him whenever Lone Oak had an "owners' party." Lone Oak held these "owners' parties" to encourage owners to buy additional property in the development. Robinson was at the "owners' parties" to offer financing for the additional purchases. See Video Deposition of Gary Cooper at 208-09, June 28, 2010, ECF No. 435. Robinson says he nevertheless never saw any such display. See Videotaped Oral Deposition of Phil Robinson at 53-54, July 2, 2010, ECF No. 434.

Even if the court assumes Robinson did see the displays but failed to object, Plaintiffs cannot proceed based on the displays. In the first place, no Plaintiff claims to have relied solely on the displays in concluding that Hannah had authority to act for BOA. If the court puts aside all the other circumstances identified by Plaintiffs as lacking any indicia of acquiescence or agreement by BOA and examines only BOA's purported agreement to the displays, Plaintiffs' claims cannot rest on the displays absent allegations that the displays, without more, misled Plaintiffs. In the second place, a display of BOA's logo or a reference to BOA as a "banking partner" does not suggest that BOA was acting as anything more than a lender. The very use of the

word "banking" before "partner" is evidence that BOA's role was that of a traditional bank, i.e., to make loans, not to develop a project.  Any conclusion by a borrower that a "banking partner" was acting as a developer is not reasonable.

Turning then to Plaintiffs' reliance on Hannah's daily conversations with Robinson, this court notes that Plaintiffs do not say that they overheard these conversations.  The conspicuous absence of such an allegation means that the daily conversations could not have led Plaintiffs to believe that Hannah could bind BOA.  At best, Plaintiffs might have known that Robinson told Hannah that some Plaintiffs' credit scores were high enough to qualify them for BOA loans.  See Hannah Depo. at 184, ECF No. 431.  No rational juror would think that that was a sufficient basis for anyone to believe that Hannah had the authority to represent and bind BOA.

There is no evidence that BOA authorized Hannah to negotiate terms or make representations on its behalf.  Nor is there any evidence indicating that BOA knew or permitted Hannah to do so.  To the contrary, the evidence establishes that Hannah, not BOA, was guaranteeing interest rates.  See Handwritten worksheets, ECF No. 348-4 (attached to BOA's Concise Statement as Ex. I) ("Billy will buy DN rate above"; "Billy will buy DN to Rate Above"; and "Billy Hannah Guarantees 5.5% buy down at Bank of America").  Although reasonableness is usually a jury

31

question, Plaintiffs simply fail to cite to any evidence from which a question of fact arises concerning whether Plaintiffs' belief that Hannah had such authority was reasonable.  See Amfac, Inc. v. Waikiki Beachcomber Inv. Co., 74 Haw. 85, 108, 839 P.2d 10, 24 (1992) (noting that reasonableness is usually a question of fact inappropriate for summary judgment, but stating that "'reasonableness' can constitute a question of law for the court when the facts are undisputed and not fairly susceptible of divergent inferences because where, upon all the evidence, but one inference may reasonably be drawn, there is no issue for the jury." (quotations omitted)).

> d.    Ratification.

Plaintiffs argue that BOA should be liable for Hannah's actions under the theory that BOA ratified those actions, adopting them as BOA's own.  Hawaii recognizes the doctrine of ratification.  Ass'n of Apartment Owners of Maalaea Kai, Inc. v. Stillson, 108 Haw. 2, 13, 116 P.3d 644, 655 (2005) ("This jurisdiction has long recognized the doctrine of ratification."). "'[R]atification' is defined as 'the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him.'" Id. at 13-14, 116 P.3d at 655-56 (quoting Maui Fin. Co. v. Han, 34 Haw. 226, 230 (1937)).

Plaintiffs argue that BOA affirmed and ratified Hannah's representations regarding loan terms by accepting and approving Plaintiffs' loan applications.  Taken at face value, Plaintiffs' argument appears to be that, by approving loans with terms other than those promised by Hannah, BOA ratified and bound itself to Hannah's promises, and therefore committed fraud and other legal wrongs by issuing loans that did not meet those promises.  Plaintiffs' argument is nonsensical.  To the extent BOA ratified anything, it ratified the actual terms.  Any terms promised by Hannah that were not contained in the loans (potential misrepresentations) could not have been ratified because BOA cannot be said to have affirmed them.

    2.   Partnership.

Plaintiffs allege in the Complaint that BOA and Lone Oak "purported to be and/or were partners of one another in the development of the Villages and, therefore, are liable to Plaintiffs for the acts of one another."  Compl. ¶ 153; see also Compl. ¶¶ 144-54; Haw. Rev. Stat. § 425-117 (stating that, with certain exceptions, "all partners are liable jointly and severally for all obligations of the partnership unless otherwise agreed by the claimant or provided by law").  Plaintiffs have abandoned the actual partnership contention and are relying solely on the existence of a purported partnership.  See

Opposition at 21-22 (arguing only that a purported partnership existed).

Under Hawaii law, a purported partner may be liable as follows:

> If a person, by word or conduct, purports to be a partner, or consents to being represented by another as a partner, in a partnership or with one or more persons not partners, the purported partner is liable to a person to whom the representation is made, if that person, relying on the representation, enters into a transaction with the actual or purported partnership.  If the representation, either by the purported partner or by a person with the purported partner's consent, is made in a public manner, the purported partner is liable to a person who relies upon the purported partnership even if the purported partner is not aware of being held out as a partner to the claimant.

Haw Rev. Stat. § 425-119(a).

Plaintiffs argue that a purported partnership is established based on Lone Oak's marketing materials listing BOA as a "banking partner," Hannah's alleged representations to Plaintiffs that BOA was Lone Oak's "partner," and Plaintiffs' reliance on their belief that BOA was a partner.  Plaintiffs contend that BOA can be held liable as a purported partner even if BOA did not know it was being held out as partner.  This argument fails.

Given the absence of evidence that BOA even knew that Hannah was allegedly describing BOA as Lone Oak's "partner," the only evidence supporting Plaintiffs' purported partnership argument is the marketing material in which BOA and Developer

34

Finance Corporation were described as "banking partners."  That BOA may have been a "banking partner" does not demonstrate that BOA consented to be or held itself out as anything more than a lender.  <u>See, e.g.</u>, Lone Oak Training Manual at 17, ECF No. 420-3 ("B of A is a type of financing"); Adjustable Rate Notes attached as BOA's Ex. U (BOA 00490-95--Roger J. Braun Note; BOA00614-19--Robert and Johanne Bray Note; BOA 00342-47--Albert E. Leong Note; BOA 01431-36--Lisa Tachibana Note).  Plaintiffs are trying to equate a "banking partner" with a "real estate development partner."  Nothing in the record supports this equivalence.

Plaintiffs argue that the second sentence of section 425-199(a) should be read as follows: "If the representation, either by [Lone Oak] or by a person with [Lone Oak]'s consent, is made in a public manner, [BOA] is liable to a person who relies upon the purported partnership even if [BOA] is not aware of being held out as a partner to the claimant."  This reading distorts the statute by defining "purported partner" inconsistently in the same sentence.  It also makes the second sentence of section 425-199(a) contradict the first, which requires BOA to make or consent to a representation of partnership before it is bound as a purported partner.  In short, Plaintiffs' reading of section 425-199(a) flies in the face of the letter and the clear intent of the statute.

V.        CONCLUSION.

For the foregoing reasons, summary judgment is granted

in favor of BOA and against Plaintiffs.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, September 24, 2010.



/s/ Susan Oki Mollway
Susan Oki Mollway
Chief United States District Judge


Tachibana, et al. v. Colorado Mountain Dev., Inc., et al., Civ. No. 07-00364 SOM/BMK,
ORDER GRANTING DEFENDANT BANK OF AMERICA'S MOTION FOR SUMMARY JUDGMENT