# UNITED STATES DISTRICT COURT
## DISTRICT OF HAWAII

LAWRENCE TACHIBANA, et al.,      )
     )
         Plaintiffs,      )
     )     No. 07-CV-00364
         v.      )
     )     Hon. Marvin E. Aspen
COLORADO MOUNTAIN      )
DEVELOPMENT, INC., et al.,      )
     )
         Defendant.      )
     )

## MEMORANDUM OPINION AND ORDER

MARVIN E. ASPEN, District Court Judge:

On January 13, 2009, Plaintiffs Lawrence Tachibana, et al., filed a sixteen-count

amended complaint against the following defendants: (1) Colorado Mountain Development, Inc.,

d/b/a Lone Oak Land Development Company, L.P.; (2) Lone Oak Land Management, LLC;

(3) C.M.D. Management, Inc.; (4) 3D Resorts, Inc.; (5) William Hannah; (6) Bank of America,

N.A.[1]; and (7) Jerry Dunn.  In the present motion, Defendants Colorado Mountain Development,

Inc. ("CMD") and Jerry Dunn (collectively "Defendants") seek summary judgment on all ten

counts against them, which include:  (1) Breach of Implied Covenant of Good Faith and Fair

Dealing (Count IV); (2) Intentional Misrepresentation/Fraud (Count V); (3) Negligent

Misrepresentation (Count VI); (4) Detrimental Reliance (Count VII); (5) Unfair and Deceptive

Trade Practices, H.R.S. § 480-2 (Count VIII); (6) Hawaii Land Sales Practices Act, H.R.S. Ch.

484 (Count IX); (7) Fraud, Fraudulent Concealment and Deceit (Count X); (8) Rescission

(Count XI); (9) Alter Ego (Count XII); and (10) Fraudulent Transfer (Count XV).  For the

---

[1] All claims filed by and against Bank of America have been dismissed.

reasons discussed below, we grant the motion in part, and deny it in part. Specifically, we grant the motion as to Counts IV, XI and XV. We also grant the motion and dismiss Count VII as to Dunn, but not as to CMD. All other claims against Dunn and CMD remain pending for trial.

## BACKGROUND FACTS[2]

Plaintiffs Lawrence Tachibana, Lisa Tachibana, Albert Leong, Roger Braun, Robert Bray, and Johanne Bray are residents of Kauai who purchased residential lots in a subdivision in Lone Oak, Texas called The Villages at Lone Oak ("the Villages"). (Compl. ¶¶ 1–4, 7–8, 24, 29, 31, 33.) Defendant William Hannah, a land sales representative for the Villages, solicited Plaintiffs' property purchases. (Compl. ¶¶ 23–24, 29, 31, 33.) Plaintiffs then entered into contracts with Defendant Lone Oak Land Development, L.P. ("Lone Oak Development") to buy lots in the Villages. (Defs.' Facts ¶ 8.) According to the complaint, the Villages development project was owned and managed by some or all of Defendants: Dunn and CMD; Lone Oak Development; Lone Oak Land Management, LLC; CMD Management, Inc.; and 3D Resorts, Inc. Plaintiffs initially filed suit on July 1, 2007, after realizing that the Villages development was not coming along as expected. Rather than present the hodgepodge of additional facts at this point, specific facts will be discussed as necessary in the analysis of the various claims below.

## STANDARD OF REVIEW

Summary judgment is proper only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for

---

[2] Unless otherwise noted, the facts described in this memorandum are undisputed and derived from the parties' Local Rule 56.1 statements of facts and exhibits.

the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). This standard places the initial burden on the moving party to identify those portions of the record that "it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (internal quotations omitted). Once the moving party meets this burden of production, the nonmoving party "must go beyond the pleadings" and identify portions of the record demonstrating that a material fact is genuinely disputed. *Id.*; Fed. R. Civ. P. 56(c). In deciding whether summary judgment is appropriate, we must accept the nonmoving party's evidence as true, and draw all reasonable inferences in that party's favor. *See Anderson*, 477 U.S. at 255.

## ANALYSIS

**1.      Counts IV (Breach of Implied Covenant) and XI (Rescission)**

In Count IV, Plaintiffs allege that Defendants breached the covenant of good faith and fair dealing implicitly contained in their contracts for the land purchases at the Village. (*See* Compl. ¶¶ 92–96.) On December 29, 2009, Judge King dismissed this claim as against Dunn on his 12(c) motion, because he was not a party to the contracts at issue. (12/29/09 Op., Dkt. No. 239, at 1–2.) Applying the same rationale, CMD contends that it, too, cannot be liable for this alleged breach because it was not a signatory to any of Plaintiffs' contracts. (Mem. at 11–12.) Similarly, Dunn and CMD argue that Count XI for rescission must fail because they were not parties to any of the contracts at issue. (Mem. at 16–17.)

Plaintiffs offered no substantive response in opposition to Defendants' motion as to Counts IV and XI. Indeed, at oral argument, Plaintiffs acknowledge that they have intentionally abandoned these claims. Accordingly, Counts IV and XI are dismissed.

## II. Counts V (Intentional Misrepresentation), VI (Negligent Misrepresentation), X (Fraud) and VII (Detrimental Reliance)

In Counts V, VI, VII and X, Plaintiffs allege in various ways that Defendants misled them, with the result that Plaintiffs relied on certain misinformation in agreeing to purchase lots at the Village, to their detriment. (Compl. ¶¶ 97–109, 122–123.) Defendants have not challenged the factual underpinnings of these claims or attacked each element necessary for Plaintiffs to prevail on these claims. Rather, Defendants focus on a threshold issue: whether Dunn can be held liable for misrepresentations he did not personally make.[3]

### A. Dunn's Potential Liability for Counts V, VI and X

The parties do not dispute that, prior to purchasing their lots, Plaintiffs had no interaction whatsoever with Dunn. (Defs.' Facts ¶ 11.) Dunn did not speak directly with any of Plaintiffs

---

[3] The parties do not address in detail CMD's potential liability for Lone Oak Development's alleged conduct. Rather, the parties generally debate the merits of Plaintiffs' claims against Dunn based on his involvement in the Villages' development. (*See, e.g.*, Resp. at 15–20 (focusing on Dunn's alleged misconduct and liability); Reply at 6–11.) The complaint alleges that CMD was doing business as Lone Oak Development and that the two were affiliated. (*See* Compl. ¶¶ 11, 72–73.) The record shows that CMD performed "administrative functions" for Lone Oak Development, such as accounting, processing mail, and collections. (*See* Pls.' Facts, Ex. 5, Dunn Dep. at 58.) Evidence in the record also suggests, however, that CMD may have had a more substantial role in the development process beyond its administrative functions. (*Id.* at 132–37 (testifying that CMD "assisted in the development process"); *see* Pls.' Facts, Ex. 14, Map included in Villages' marketing materials (identifying CMD as "The Developer" and showing its previously-developed properties in Colorado); Pls.' Facts, Ex. 15, Li. Tachibana Resp. to Interrogatories ¶ 2 at 4 (stating that Hannah showed this particular map to the Tachibanas in his sales pitch).) Neither the complaint, nor the record before us, explains the precise nature of the relationship between CMD and Lone Oak Development. Without additional information about that relationship and its legal significance, we cannot conclude that CMD cannot be liable for Lone Oak Development's conduct. We find that, in addition to specific factual issues discussed later in this opinion, genuine questions of material fact preclude summary judgment for CMD on all remaining claims against it—Counts V through X. In light of the above, and like the parties, we primarily focus hereafter on Dunn's liability when analyzing the pending motion.

until he held a meeting in Kauai in early 2007, long after they had bought into the Villages.[4] (*See* Defs.' Facts ¶ 11; *see also* Defs.' Facts, Ex. D, La. Tachibana Dep. at 116–17; Defs.' Facts Ex. K, R. Braun Dep. at 171–72; Defs.' Ex. L, Leong Dep. at 185; *see, e.g.*, Pls.'s Facts ¶¶ 43–44.)  To the contrary, the parties acknowledge that Plaintiffs dealt directly with Defendant Hannah, who marketed the Villages to Plaintiffs in his role as salesperson for Lone Oak Development.  (*See, e.g.*, Pls.' Facts ¶¶ 1–2, 9–10, 12–18, 41.)  Plaintiffs contend that Hannah and/or Lone Oak Development made multiple misrepresentations inducing them to purchase lots.  (*See* Pls.' Facts ¶¶ 8, 19–22, 24-30, 32–40.)  For example, Hannah's sales training, which he followed dutifully, stressed that Lone Oak Development had extensive experience cultivating properties, that the Villages would have beautiful amenities, including a golf course and marina, and that Bank of America was a partner in the deal.  (*Id.* ¶¶ 7, 9, 14, 31.)  These claims, however, turned out to be largely untrue.  (*Id.* ¶¶ 7–8, 19–24, 27–30, 39–40, 47; *see also id.* ¶¶ 32–42.) Plaintiffs argue that Dunn can be liable for these misrepresentations not only under their alter ego theory (Count XII), but also because he "actively or passively participated in the unlawful misrepresentations."  (Resp. at 19 (quotation omitted).)

Hawaii and Ninth Circuit precedent establish that officers or directors "may be personally liable for the tortious conduct of the corporation, if they actively or passively participated in such unlawful conduct."  *Fuller v. Pac. Med. Collections, Inc.*, 78 Haw. 213, 225, 891 P.2d 300, 313 (Haw. 1995); *Cahill v. Haw. Paradise Park Corp.*, 56 Haw. 522, 526, 543

---

[4] Plaintiffs have not alleged that Dunn's misrepresentations at that meeting caused a distinct, additional harm.  As a result, Plaintiffs could not have relied on Dunn's 2007 misrepresentations to their detriment, and those statements cannot be the basis of their misrepresentation and fraud claims.  Plaintiffs concede as much in their response brief, by arguing Dunn's liability only as to misrepresentations made by Hannah and Lone Oak Development—and not as to his 2007 statements.  (Resp. at 18–20.)

P.2d 1356, 1360 (Haw. 1975); *E. Star, Inc. v. Union Bldg. Materials Corp.*, 6 Haw. App. 125, 134–36, 712 P.2d 1148, 1155 (Haw. App. 1985); *see Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 734 (9th Cir. 1999). Liability may be imposed not only on a director or officer who personally commits the tort, but also on one who directs, orders or participates in the tortious conduct. *Kukui Gardens Corp. v. Holco Cap. Group, Inc.*, No. 08-00049, 2010 WL 145284, at *9 & n.28 (D. Haw. Jan. 12, 2010) (citing 18B Am. Jur. 2d Corps. § 1629); *see Wolf Designs, Inc. v. DHR & Co.*, 322 F. Supp. 2d 1065, 1072 (C.D. Cal. 2004) (quotation omitted) (noting that liability is generally imposed if the corporate officer was the "guiding spirit" or "central figure" behind the conduct). Under such circumstances, "there is no need to pierce the corporate veil to establish the personal liability of a corporate officer for the tortious conduct of a corporation." *Kukui Gardens Corp.*, 2010 WL 145284, at *9; *see also Chase Inv. Servs. Corp. v. Law Offices of Jon Divens & Assocs.*, No. 09-9152, 2010 WL 4056022, at *28 (C.D. Cal. Oct. 14, 2010) ("This principle applies regardless of the piercing of the corporate veil.").

Our inquiry thus becomes whether, on the record before us, a reasonable jury could conclude that Dunn was a participant or "guiding spirit" in the alleged tortious misrepresentations. *See Wolf Designs, Inc.*, 322 F. Supp. 2d at 1072. It is undisputed that Dunn was the sole shareholder of Lone Oak Development's general partner, Lone Oak Management. (Pls.' Facts ¶¶ 46, 51.) As such, he was "the boss" and exercised complete control over development of the Villages. (*Id.*; *see, e.g.*, Pls.' Facts, Ex. 5, Dunn Dep. at 44 (acknowledging that he was the final decisionmaker).) The marketing materials devised by Lone Oak Development, and followed by Hannah per his training, emphasized Dunn's track record as a

developer[5] and boldly claimed that "[e]verything Jerry Dunn touches turns to gold."  (*See* Pls.'

Facts ¶¶ 2–9, 12–15.)  Individually, these facts are not particularly noteworthy; taken together,

however, they permit an inference that Dunn was at least aware of the marketing techniques

employed by Lone Oak Development, especially since he was the focus thereof.  (*See id.*)

That being said, the record does not describe in detail what Dunn knew or did not know,

in his capacity as "the boss," about the specific marketing ploys Lone Oak Development and

Hannah used in dealings with Plaintiffs.  The parties do not dispute, however, that Dunn met

with Hannah to discuss his sales pitch before he traveled to Hawaii and sold lots to Plaintiffs.

(Pls.' Facts ¶ 11; Ex. 1, Hannah Dep. at 139–41; *see* Pls.' Facts, Ex. 2, Hannah 1/11/10 Resp. to

La. Tachibana's 1st Req. to Admit ¶¶ 4–8.)  Hannah testified that he and Dunn specifically

discussed, to some degree, the sales presentation Hannah would be giving potential purchasers in

Hawaii.  (Pls.' Facts, Ex. 1, Hannah Dep. at 141:19–22; *see also* Pls.' Facts, Ex. 2, Hannah

1/11/10 Resp. ¶¶ 6–7.)  Although Defendants stress that there is no evidence that Dunn was

personally involved in creating marketing materials (Reply at 8),[6] they ignore the uncontroverted

testimony that Dunn may have known, or even directed, what Hannah would be telling

Plaintiffs—including any of the alleged misrepresentations.  (Pls.' Facts ¶ 11; Ex. 1, Hannah

---

[5] We need not evaluate the contention that Dunn's experience as a developer was
exaggerated.  The real issue, as indicated in the record, seems to be that the materials promoting
the Villages represented Dunn's successes as being Lone Oak Development's and CMD's prior
successes.  (*See, e.g.*, Pls.' Facts ¶¶ 7–8, 27–30; Ex. 5, Dunn Dep. at 108–12 (admitting that
Lone Oak Development did not develop any of the twenty-two properties identified in its
marketing materials as its past experience, and that CMD had marketed one of the twenty-two
but never really developed any of them).)

[6] At oral argument, Plaintiffs' counsel mentioned that discovery revealed copies of
Dunn's edits of the Lone Oak Development marketing materials, but those documents are not
currently before us.

Dep. at 139–41.)  The record before us is murky about their discussion at this meeting and Dunn's level of involvement in the marketing of the Villages.  Accordingly, there are genuine questions of material fact concerning whether Dunn actively or passively participated in the alleged misrepresentations made by Hannah and/or Lone Oak Development.  We thus cannot find that Dunn is immune from liability for Counts V, VI and X at this stage.[7]

### B.    Dunn's Potential Liability for Count VII (Detrimental Reliance)

We reach a different conclusion as to Count VII, however.  In Count VII, Plaintiffs assert a claim of "detrimental reliance."  (Compl. ¶¶ 105–09.)  Defendants argue that Hawaii does not recognize a "detrimental reliance" claim, but this argument misses the mark.  Based on our review of the complaint and pertinent authorities, we construe Count VII as a claim for promissory estoppel.  Indeed, the Supreme Court of Hawaii has defined the essence of promissory estoppel as "detrimental reliance on a promise."  *Ravelo v. Hawaii Cty.*, 66 Haw. 194, 199, 658 P.2d 883, 887 (Haw. 1983); *see Gonsalves v. Nissan Motor Corp.*, 100 Haw. 149, 164–65, 58 P.3d 1196, 1211–12 (Haw. 2002); *see also Shahata v. W Steak Waikiki, LLC*, 721 F. Supp. 2d 968, 982(D. Haw. 2010); *Hi-Pac, Ltd. v. Avoset Corp.*, 26 F. Supp. 2d 1230, 1237 (D.

---

[7] In their motion, Defendants do not argue that the other elements of the misrepresentation and fraud claims have not been met.  They contend only that Dunn cannot be liable because he made no representations to Plaintiffs on which they could have relied.  (Mem. at 12–14; Reply at 6–9.)  As a result, we need not address the claims more specifically.

Relatedly, Defendants' argument opposing Plaintiffs' "fraudulent concealment" claim, found in Count X, is short-sighted.  Defendants contend that there is no such claim under Hawaiian law.  (Mem. at 13–14.)  We interpret the reference to "fraudulent concealment" as simply a means of clarifying for Defendants that the type of fraud alleged includes fraud by omission and concealment, and not just affirmative conduct.  (Compl. ¶¶ 122–23.) *See, e.g.*, *Sung v. Hamilton*, 710 F. Supp. 2d 1036, 1047 (D. Haw. 2010) (treating "fraudulent concealment" claim as fraud based on alleged failures to disclose information); *Isham v. Padi Worldwide Corp.*, No. 06-00382, 2008 WL 877123, at *6–7 (D. Haw. Apr. 2, 2008) (explaining that the reference to "fraudulent concealment" was not to raise the claim for purposes of tolling the statute of limitations, but to "specify the type of fraud at issue").

Haw. 1997) (using the terms "promissory estoppel" and "detrimental reliance" interchangeably). Accordingly, we need not dismiss Count VII on this basis.

Nonetheless, Plaintiffs cannot pursue a claim for promissory estoppel against Dunn personally, in the absence of any direct, actionable promises made by him. While officers and directors can be held liable for the torts committed by corporations, we found no authority extending this principle to non-tort claims, such as promissory estoppel. Promissory estoppel is a quasi-contractual, equitable claim. *See Shahata*, 721 F. Supp. 2d at 984 (describing promissory estoppel as a "quasi-contractual remedy" as opposed to a tort); *CIM Ins. Corp. v. Masamitsu*, 74 F. Supp. 2d 975, 986 (D. Haw. 1999) (referring to promissory estoppel as a "contract-like claim"); *3139 Props., LLC v. First Specialty Ins. Corp.*, No. 06 C 00619, 2007 WL 1701922, at *8 n.1 (D. Haw. June 8, 2007) (noting that promissory estoppel is an equitable and "contract-based claim"). Promissory estoppel is thus different in nature than the misrepresentation claims (even if based on the same facts), and we decline to adopt Plaintiffs' assumption that Dunn could be liable for both based on Hannah's and Lone Oak Development's conduct.

Moreover, the evidence before us concerning Dunn's alleged promises to Plaintiffs is not sufficient to withstand summary judgment. To prevail on a promissory estoppel claim against Dunn, Plaintiffs would need to prove that they in fact relied on a promise he made, which would have occurred during the 2007 Kauai meeting. *Gonsalves*, 100 Haw. at 164–65, 58 P.3d at 1211–12; *see White v. Pac. Media Group, Inc.*, 322 F. Supp. 2d 1101, 1108–09 (D. Haw. 2004); *Ravelo*, 66 Haw. at199, 658 P.2d at 887. Even assuming that Dunn made specific promises at that time, Plaintiffs have not demonstrated that they relied on such promises in any way. Accordingly, we grant the motion as to Count VII as to Dunn.

**III.    Count VIII (Unfair and Deceptive Trade Practices)**

In Count VIII, Plaintiffs allege that Defendants violated Hawaii's unfair and deceptive

practices act. (Compl. ¶¶ 110–14.) *See* H.R.S. § 480-2. Section 480-2 makes illegal any "unfair

or deceptive practices or acts in the conduct of any trade or commerce."[8] *Id.*; *see Yokoyama v.*

*Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1092 (9th Cir. 2010). Deceptive practices under

§ 480-2 include "acts that mislead consumers," such as representations or omissions that are

likely to mislead reasonable consumers, where the representation or omission is material.

*Yokoyama*, 594 F.3d at 1092; *see also E. Star, Inc.*, 6 Haw. App. at 133, 712 P.2d at 1154

(describing "deception as an act causing, as a natural and probable result, a person to do that

which he would not otherwise do"). "Unfair" practices are those that "offend[] established

public policy" where "the practice is immoral, unethical, oppressive, unscrupulous or

substantially injurious to consumers." *E. Star, Inc.*, 6 Haw. App. at 133, 712 P.2d at 1154. As

the Hawaii Supreme Court has noted, this law was "constructed in broad language in order to

constitute a flexible tool to stop and prevent fraudulent, unfair or deceptive business practices for

the protection of both consumers and honest businessmen." *Yokoyama*, 594 F.3d at 1092

(quoting *Ai v. Frank Huff Agency*, 61 Haw. 607, 616, 607 P.2d 1304, 1311 (Haw. 1980));

*E. Star, Inc.*, 6 Haw. App. at 132, 712 P.2d at 1154.

Defendants do not contend that this statute does not apply to the general facts of this

case, or that Plaintiffs failed to satisfy the elements of a § 480-2 claim. For example, they do not

argue that Plaintiffs are not "consumers" under the statute, that Plaintiffs were not acting

---

[8] Brokers and salespersons (like Hannah) actively involved in real estate transactions in a business context are engaged "in the conduct of any trade or commerce" for purposes of § 480-2. *See W. Sunview Props., LLC v. Federman*, 338 F. Supp. 2d 1106, 1124 (D. Haw. 2004).

reasonably, that the alleged misrepresentations were not "material" or "unethical," or the like.[9]

Rather, Defendants argue that they cannot be liable because they had no involvement in the

alleged deceptive acts.[10]  (Mem. at 14–15; Reply at 9–11.)

Plaintiffs rely on § 480-17 as the basis for Dunn's personal liability in this instance.

Under § 480-17, "individual directors, officers, or agents" of a corporation may be liable for the

entity's statutory violations if they "authorized, ordered, or [did] any of the acts constituting in

whole in part the violation."  H.R.S. § 480-17(a); *E. Star, Inc.*, 6 Haw. App. at 133, 712 P.2d at

1154; *see Killian v. Pac. Educ. Servs. Co.*, No. 05-00468, 2007 WL 1303023, at *5 (D. Haw.

May 3, 2007).  As with the misrepresentation claims addressed earlier, Dunn may be held liable

to the extent that he actively or passively participated in the alleged deceptive and unfair

practices allegedly perpetrated by Hannah and Lone Oak Development.  *E. Star, Inc.*, 6 Haw.

App. at 133, 712 P.2d at 1154; *see Killian*, 2007 WL 1303023, at *5.  Thus, we deny the motion

for summary judgment as to Count VIII, for the same reasons we deny it as to Counts V, VI and

X.  That is, given the lingering questions about Dunn's knowledge and involvement in the

---

[9] To the extent that Defendants attempt to raise such arguments in their reply brief (Reply at 9–10), we will not consider them.  L.R. 7.4 ("Any argument raised for the first time in the reply shall be disregarded.");  *see Graves v. Arpaio*, 623 F.3d 1043, 1048 (9th Cir. 2010) (noting that "arguments raised for the first time in a reply brief are waived"); *Durham v. Cty. of Maui*, No. 08-00342, 2010 WL 3452388, n.2 (D. Haw. Aug. 31, 2010) ("[T]he court will not address an argument raised for the first time in a reply.").

[10] Defendants also contend that Plaintiffs cannot pursue a § 480-2 claim because their contracts with Lone Oak Development "set forth the terms and conditions pertaining to the property . . . and *disclaimed any pre-contractual warranties or representations*."  (Mem. at 15 (emphasis added).)  Defendants repeated this claim at oral argument, yet have cited no authority in support of this theory.  It seems unlikely—given the broad, remedial nature of the consumer protection statute—that such disclaimers would bar Count VIII.  Without precedential authority confirming Defendants' proposition, we decline to dismiss Count VIII on this basis.

marketing of the Villages—particularly Hannah's sales presentation to Plaintiffs—summary judgment is inappropriate.

## IV.    Count IX (Land Sales Practices Act)

Among other things, Hawaii's Land Sales Practices Act ("LSPA") provides that no person selling interests in subdivided lands (like a developer) may offer or dispose such interests "before a preliminary or final order registering the subdivided land is entered." H.R.S. § 484-4(1). In addition, § 484-16(a) renders it unlawful to make "an untrue statement of a material fact" in a registration, or to "omit[] a material fact required to be [included] in a registration statement" that would make the statement itself not misleading. H.R.S. § 484-16(a). Boiled down, Hawaii thus requires that sellers of property file accurate registration statements about the property, before soliciting and making sales. The LSPA also imposes liability for statutory violations on "every person who directly or indirectly controls a subdivider" and "every general partner, officer, or director of a subdivider," unless such an individual proves that he or she was unaware of, and could not have known about, the violation.[11] H.R.S. § 484-16(c). In Count IX, Plaintiffs allege that Defendants violated the LSPA in several respects.

First, Plaintiffs contend—and Judge King held—that the Villages were not registered in the state of Hawaii as required by § 484-4(1). (8/29/08 Op., Dkt. No. 89, at 5–8, 20 (concluding that the project "should have been registered in Hawaii . . . before Hannah solicited offers" or before the parties executed the sales contracts).) Thus, "statutory violations were committed." (*Id.* at 20.)

---

[11] This joint and several liability also extends to "every person occupying a similar status or performing a similar function, every employee of the subdivider who materially aids in the disposition, and every agent who materially aids in the disposition." H.R.S. § 484-16(c).

Second, Plaintiffs argue that Defendants misrepresented Hannah's ability to legally sell property in Hawaii without a license.  (Resp. at 22–23.)  Indeed, Judge King previously found that Hannah was not licensed as a broker or agent in Hawaii, although an agent or broker was required.  (*See* 8/29/08 Op., Dkt. No. 89, at 8–9.)  The record shows that Hannah asked Dunn whether he was authorized to sell lots in Hawaii, and Dunn (a lawyer) informed Hannah that there was no need for a license as long as he worked for the developer.  (Pls.' Facts ¶ 26; Ex. 1, Hannah Dep. at 140–41.)  Moreover, in February 2007, prior to the Kauai meeting, Dunn specifically told the Tachibanas that Hannah did not have to be licensed in Hawaii because he worked for the developer.  (Pls.' Facts, Ex. 7, Li. Tachibana Dep. at 168–69.)  Plaintiffs point to these facts as evidence of Defendants' misrepresentations.[12]  (Resp. at 22–23.)  In his opinion, Judge King agreed that Hannah misrepresented his status in violation of the LSPA but concluded that proof of Plaintiffs' reliance on the misstatement, and its materiality, barred summary judgment in their favor.  (8/29/08 Op., Dkt. No. 89, at 10–11, 18–19.)

Third, Plaintiffs assert that numerous other alleged representations—such as the claims about the golf course and marina, Lone Oak Development's past successes, Bank of America's participation as a partner in the Villages, the construction timetable,[13] and the limited lot

---

[12] It is unclear whether Plaintiffs are also alleging that these facts establish additional statutory violations.

[13] For example, Lisa Tachibana testified that Hannah said the construction of the Villages, including the golf course, would be completed in 2007.  (Pls.' Facts ¶¶ 19, 32; Ex. 7, Li. Tachibana Dep. at 123.)

inventory available for purchase[14]—constituted "untrue statements of material fact" under § 484-16(a).  (Resp. at 21–22; *see id.* at 9–11; *see also* Pls.' Facts ¶¶ 7–8, 18–19, 24, 27–42.)  Based on the above, Plaintiffs contend that Defendants are liable for LSPA violations.

In tune with their theme, Defendants contend that Count IX must be dismissed because they played no part in the alleged misrepresentations identified by Plaintiffs.[15]  (Mem. at 15–16.)  As previously stated, genuine questions of material fact plague this theory.  Moreover, Defendants conveniently overlook: (1) testimony that Dunn personally misrepresented Hannah's ability to sell lots to Plaintiffs; (2) Judge King's prior conclusions regarding the statutory violations, including Plaintiffs' substantiated claim under § 484-4(1); and (3) the LSPA's unambiguous imposition of director, officer and general partner liability.  Defendants are not entitled to summary judgment on Count IX.

## V.    Count XII (Alter Ego)

In Count XII, Plaintiffs contend that Dunn should be liable for the conduct of the corporate defendants, as their alter ego.  (Compl. ¶¶ 126–28.)  In Hawaii, the law may set aside the corporate form "where the recognition of the corporate fiction would bring about injustice and inequity or when there is evidence that the corporate fiction has been used to perpetrate a fraud."  *Robert's Hawaii Sch. Bus, Inc. v. Laupahoehoe Trans. Co.*, 91 Haw. 224, 241–42, 982 P.2d 853, 870–71 (Haw. 1999); *Television Events & Mktg., Inc. v. Amcon Dist. Co.*, 484 F. Supp.

---

[14] Hannah apparently impressed upon Plaintiffs that lots at the Villages were selling quickly, and that Hunt County, Texas (where the Villages are located) was one of the fastest growing counties in the United States.  (Pls.' Facts ¶¶ 18, 41–42.)  He also allegedly informed Plaintiffs that a former Dallas Cowboys football player owned lots at the Villages and that the roads would be paved with asphalt.  (*Id.* ¶¶ 34–38.)  According to Plaintiffs, all of these statements are untrue.  (*Id.* 35, 37–38; Resp. at 11.)

[15] Defendants abandon this argument in their reply brief.

2d 1124, 1142 (D. Haw. 2006); *see JJCO, Inc. v. Isuzu Motors Am., Inc.*, No. 08-00419, 2009 WL 3245556, at *9 (D. Haw. Oct. 9, 2006).

The Supreme Court of Hawaii has identified numerous factors to consider when conducting an alter ego analysis. These factors include, *inter alia*: (1) "commingling of funds and other assets, failure to segregate funds of the separate entities, and the unauthorized diversion of corporate funds or asserts to other than corporate uses;" (2) an individual's treatment of corporate assets as his own; (3) "the holding out by an individual that he is personally liable for the debts of the corporation;" (4) "the identical equitable ownership" of the entities; (5) the "identity of directors and officers . . . in the responsible supervision and management;" (6) "sole ownership of all of the stock" by a single person or family; (7) "use of the same office or business location;" (8) "use of a corporation as a mere shell;" (9) "the concealment and misrepresentation of the identity of the responsible ownership, management and financial interest;" and (10) "the disregard of legal formalities and the failure to maintain arms' length relationships among related entities." *Robert's Hawaii*, 91 Haw. at 242, 982 P.2d at 871; *Television Events*, 484 F. Supp. 2d at 1142. "Generally speaking, the question whether a corporation is a mere agency, instrumentality, or alter ego of another . . . individual is one of fact." *Robert's Hawaii*, 91 Haw. at 238, 982 P.2d at 867; *Television Events*, 484 F. Supp. 2d at 1142. Ordinarily, an alter ego claim should not be dismissed at the summary judgment stage "in view of the complex economic questions often involved, especially if fraud is alleged." *Robert's Hawaii*, 91 Haw. at 238–39, 982 P.2d at 867 (internal quotation omitted); *Television Events*, 484 F. Supp. 2d at 1142.

That being said, summary judgment is appropriate "where no genuine issue of fact is raised," as Defendants argue here. Defendants contend that Plaintiffs' alter ego theory fails

because there is no evidence to satisfy any of the critical factors employed by Hawaiian courts and to warrant piercing the corporate veil. (Mem. at 17–20; Reply at 11–13.) For example, Defendants argue that there is no evidence that Dunn neglected to maintain corporate formalities, undercapitalized Lone Oak Development, or misused its corporate form. (*Id.*) Moreover, Defendants point to Dunn's earlier declaration that "to the best of [his] knowledge . . . the various entities maintained separate corporate minutes and records and observed corporate formalities," including separate bank accounts, and he "did not commingle any personal funds with any of these entities." (Pls.' Facts, Ex. 29, Dunn 4/17/09 Decl. ¶ 5.)[16] Defendants argue that Dunn's status as "the boss" is simply insufficient to impose alter ego liability. (Mem. at 19; Reply at 12.) *See Keliihananui v. KBOS, Inc.*, No. 09-00151, 2010 WL 2176105, at *10–11 (D. Haw. May 24, 2010) (evidence of ownership "is insufficient to establish alter ego liability").

Plaintiffs, on the other hand, claim they have presented evidence sufficient to raise genuine questions of material fact about Dunn's management of the corporate entities. In addition to his exclusive control of Lone Oak Development, Plaintiffs argue that Dunn commingled personal funds with Lone Oak Development, Lone Oak Management, CMD and CMD Management, Inc. (Resp. at 25.) As evidence, they rely on Dunn's CMD credit card statement from mid-2006, which reflects purchases he made in Hawaii while allegedly on a personal vacation. (Resp. at 25–26; Pls.' Facts, Ex. 28; *see also* Pls.' Facts, Ex. 29, Dunn 4/17/09 Decl. ¶ 2 (stating that his only trips to Hawaii in the preceding ten years had been for vacation).) According to Plaintiffs, the credit card statement coupled with Dunn's testimony suggests that he used CMD corporate funds to pay for his vacation. (Resp. at 25–26.)

---

[16] Dunn did not date his declaration, but it was previously filed on April 17, 2009 in support of his motion to dismiss for lack of personal jurisdiction. (*See* Dkt. No. 127 & 127-3.)

Moreover, the statement includes handwritten notes and calculations indicating which charges should be paid by which entity, such as "L.O.," "Dunrich"[17] or "Colo. Mt. Dev." (Pls.' Facts, Ex. 28.) Contrary to Dunn's assertion that he did not commingle funds, Plaintiffs contend that Dunn thus was using the CMD credit card for personal charges and for expenses incurred by the related entities. (Resp. at 25–26.)

Plaintiffs also cite to other record evidence in support of Count XII, including Dunn's deposition testimony that he did not know whether Lone Oak Development paid its management fees to CMD, or directly to him. (Pls.' Facts, Ex. 5, Dunn Dep. at 26–27.) Dunn also could not explain why certain administrative fees paid by Lone Oak Development to CMD were so high, totaling $450,000 for 2005.[18] (*Id.* at 197.) Although the parties dispute Plaintiffs' interpretations of Lone Oak Development's tax returns,[19] there certainly is evidence that Lone Oak Development paid other Dunn-related entities significant sums of money for loan facilitation, administrative, management and marketing fees—yet the Villages' construction fell short. (*See* Pls.' Facts ¶¶ 57–61.) Of course, there may be nothing inappropriate or unfair about these fees, or with Dunn's credit card spending mentioned above. Nonetheless, Plaintiffs have

---

[17] Dunrich is another real estate development entity related to Dunn. It is not involved in this lawsuit. (*See* Pls.' Facts, Ex. 5, Dunn Dep. at 58, 70.)

[18] The management fees are different from the administrative fees. CMD received the administrative fees for performing "administrative functions" for Lone Oak Development, such as accounting, processing mail, and collections. (*See* Pls.' Facts, Ex. 5, Dunn Dep. at 58.) As compensation for CMD's services in coordinating and overseeing construction and marketing, CMD also received a management fee from Lone Oak Development, representing 7.5% of gross sales. (*See* Pls.' Facts ¶ 58 & Ex. 24 ¶ 7.12(a).)

[19] Plaintiffs argue that Lone Oak Development's tax returns show that Dunn and the related entities siphoned money away from the Villages, which then operated at a loss and suffered construction delays and failures. (Resp. at 27–28, *see also* Reply at 13.)

raised genuine questions of material fact on both points, which Defendants have not directly addressed.

Additionally, Dunn and these entities share office space at the same address, though Dunn was not sure who paid the rent. (Pls.' Facts ¶ 54 & Ex. 5, Dunn Dep. at 67.) Plaintiffs add that Dunn referred to CMD as "more or less a shell corporation," and they stress that the marketing of the Villages referred to Dunn, Lone Oak Development and CMD interchangeably as the "developer." (Pls.' Facts, Ex. 5, Dunn Dep. at 16–18.) Indeed, even Dunn had difficulty explaining which entity was the Villages' "developer." (*Id.* at 132–37 (hesitating to identify which entity was the developer and who owned it).)[20]

While we recognize that "Hawaii courts have been reluctant to disregard the corporate entity," *Robert's Hawaii*, 91 Haw. at 241, 982 P.2d at 870 n.12, we must conclude that questions of fact preclude summary judgment for Dunn on the alter ego claim at this time. Plaintiffs have come forth with evidence that could convince a reasonable jury that: (1) Dunn commingled funds and treated corporate assets at his own; (2) CMD operated as a shell corporation; (3) Dunn exclusively owned and/or controlled the relevant entities; (4) Dunn misrepresented the corporate identities to better market the Villages; (5) Dunn and the entities shared the same offices; and (6) the related entities did not maintain arms-length relationships in their dealings. *See Robert's Hawaii*, 91 Haw. at 242, 982 P.2d at 871; *Television Events*, 484 F. Supp. 2d at 1142. As we

---

[20] Although Plaintiffs further state that Dunn personally guaranteed Lone Oak Development's purchase of the Villages, the record does not support this assertion. (*See* Pls.' Facts ¶ 53 & Exs. 5, 25.) For example, Plaintiffs cite to page 28 of Dunn's deposition but neglected to provide it.

must accept Plaintiffs' evidence as true, and draw all reasonable inferences in their favor, we

deny the motion as to Count XII.[21]  *See Anderson*, 477 U.S. at 255.

## VI.    Count XV (Fraudulent Transfer)

In the final count at issue in the pending motion, Plaintiffs contend that Dunn and

Defendant 3D Resorts, Inc. ("3D") violated Hawaii's Uniform Fraudulent Transfer Act

("HUFTA").  (Compl. ¶¶ 136–43.)  Under HUFTA, a transfer is deemed "fraudulent" if the

debtor makes it "with actual intent to hinder, delay, or defraud any creditor."  H.R.S. § 651C-

4(a)(1).  A transfer may also be fraudulent in additional scenarios, if the debtor did not receive "a

reasonably equivalent value in exchange for the transfer."  *Id.* § 651-C4(a)(2); *see In re Agric.*

*Research & Tech. Group*, 916 F.2d 528, 534–35 (9th Cir. 1990); *Valvanis v. Milgroom*, 529 F.

Supp. 2d 1190, 1196–98 (D. Haw. 2007).  Although the Complaint alleges violation of § 651C-

4(a)(1) only, we shall consider both theories of recovery.  (*See* Compl. ¶ 140; *see also* Resp. at

29–30.)

Neither party disputes that, on January 14, 2008, 3D agreed to purchase from Dunn all of

his ownership interests in numerous entities, including Lone Oak Development and CMD

Management, Inc.  (Pls.' Facts ¶ 49; Defs.' Facts ¶ 12.)  In exchange for Dunn's interests, 3D

agreed to pay Dunn more than $4.4 million and to assume all debt obligations owed by Dunn

related to the pertinent companies.  (Defs.' Facts ¶ 12; Pls.' Facts, Ex. 25, Purchase Agmt. ¶3.1.)

---

[21] At oral argument, Defendants contended that Plaintiffs' alter ego claim fails because Plaintiffs cannot show that both of the two relevant corporate veils should be pierced.  That is, according to Defendants: not only must Plaintiffs pierce Lone Oak Development's veil, but also the veil of its general partner, Lone Oak Management.  (Dunn was the sole shareholder of Lone Oak Management.  (Pls.' Facts ¶¶ 46, 51.).)  Defendants neglected to brief this theory and mentioned it for the first time in their rebuttal at oral argument.  Defendants did not fairly present this particular issue, and we shall not address it at this juncture.

As Dunn admits, however, he is unlikely to receive the consideration called for in the Purchase Agreement ("Agreement") because 3D may not have the assets to pay him.  (Pls.' Facts, Ex. 5, Dunn Dep. at 73–74.)  The Agreement between Dunn and 3D described Plaintiffs' lawsuit in detail, and identified other pending legal matters as well.  (Pls.' Facts ¶ 49 & Ex. 25, Purchase Agmt. Ex. E.)  As Plaintiffs note, one of the Lone Oak Development limited partners, Jasen Miller, is also a partner of 3D Resort Communities, LLC.[22]  (Pls.' Facts ¶ 63; *see* Pls.' Facts, Ex. 12, 12/3/08 Miller Ltr. & Ex. 25, Purchase Agmt. Ex. A (at LO 46265).)  With these facts in mind, we turn to Plaintiffs' allegations.

Plaintiffs' § 651C-4(a)(1) claim requires proof that Dunn entered into the Agreement "with actual intent to hinder, delay, or defraud" Plaintiffs.  H.R.S. § 651C-4(a)(1).  In evaluating actual intent, we may consider various factors set forth in the statute, including, *inter alia*, whether the transfer: (1) "was to an insider;" (2) "was disclosed or concealed;" (3) occurred after "the debtor was sued;" or (4) involved "substantially all the debtor's assets."  *Id.* § 651C-4(b)(1), (3)–(5).  The record before us, however, lacks sufficient evidence that Dunn sold his interests to 3D with the necessary fraudulent intent.  H.R.S. § 651C-4(a)(1).  For example, although Jasen Miller holds interests in Lone Oak Development both as its limited partner and a partner of 3D, he does not appear to constitute an "insider" of Dunn's as defined by HUFTA.  *See id.* § 651C-1. And while Plaintiffs argue that Dunn transferred "all of his controlling interest and assets to 3D," (Resp. at 30), the transfer itself concerned only his interest in the Lone Oak Development entities.  In other words, Dunn transferred his interests in the Villages but did not transfer *all of his assets*, including those beyond his interests in the Villages, as contemplated by HUFTA.

---

[22] Like Plaintiffs, we assume for purposes of this analysis that 3D is related to 3D Resort Communities LLC.

H.R.S. § 651C-4(b)(5) (looking to whether the "transfer was of substantially all the debtor's assets"). Plaintiffs' reliance on Dunn's disclosure of this litigation to 3D as evidence of his fraudulent intent is both inexplicable and unexplained. Indeed, Plaintiffs fail to articulate how such a disclosure could demonstrate any fraudulent intent. (Resp. at 29–30.) If anything, this disclosure, which is typical of a purchase agreement, undermines their theory. Only one factor favors Plaintiffs—Dunn was sued prior to the transfer—but this fact alone should not propel this claim forward to trial, especially as Plaintiffs are also suing 3D. *See* H.R.S. § 651C-4(b)(4).

Plaintiffs' HUFTA claim under § 651C-4(a)(2) fares no better, as Plaintiffs have no evidence that Dunn transferred his interests "[w]ithout receiving a reasonably equivalent value in exchange." *Id.* § 651C-4(a)(2). According to Plaintiffs, 3D's failure to make payments to Dunn under the Agreement is evidence of the fraudulent nature of the transaction. (Resp. at 30; *see* Pls.' Facts, Ex. 5, Dunn Dep. at 73–74.) We agree with Dunn, however, that 3D's apparent breach of the Agreement does not prove that the consideration for Dunn's transfer was itself inadequate. 3D agreed to assume various liabilities and pay Dunn over $4 million; there is no evidence that Dunn knew 3D might not fulfill its end of the bargain or had any reason to question the value of the deal. Plaintiffs have not presented facts or legal argument sufficient to withstand summary judgment on Count XV. We therefore find in Dunn's favor as to the HUFTA claims.

**CONCLUSION**

For the reasons discussed above, we hereby grant the motion in part and dismiss

Count IV (Breach of the Implied Covenant of Good Faith and Fair Dealing) as against CMD and

Count XI (Rescission) as against both Dunn and CMD. Counts VII (Detrimental Reliance) and

XV (Fraudulent Transfer) are dismissed as against Dunn. We deny the motion as to all other

pending claims against Dunn and CMD. It is so ordered.


_____
Marvin E. Aspen
United States District Judge


Dated:          Chicago, Illinois
                April 5, 2011